**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **FEDNER PIERRE-LOUIS,** | **Civil Action No. 18-5614 (MCA)** |
| **Petitioner,** | |
| **v.** | **OPINION** |
| **THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, CHRIS PORRINO, et al.,** | |
| **Respondents.** | |

This matter has been opened to the Court by Petitioner Fedner Pierre-Louis' ("Petitioner or "defendant") filing of a Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Having reviewed the Petition, Respondent's answer, Petitioner's traverse, and the relevant record, the Court denies the Petition for the reasons stated in this Opinion and also denies a certificate of appealability ("COA").

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

In December 2004, Petitioner Fedner Pierre-Louis was convicted by a jury of aggravated manslaughter, robbery, felony murder, unlawful possession of a firearm, and possession of a firearm for an unlawful purpose. The charges related to the killing of Dr. Jeffrey Perchick on March 1, 2002, in the parking lot of the Wyndham Hotel in Elizabeth, New Jersey.  *See State v. Pierre-Louis*, 216 N.J. 577, 578–79 (2014).

---

[1] The factual background is taken from the state court record, including the New Jersey Appellate Division's opinion denying Petitioner's direct appeal, the New Jersey Supreme Court's decision remanding the matter for a second PCR hearing, and the Appellate Division's decision affirming denial of Petitioner's PCR on remand.

In its decision denying Petitioner's direct appeal, the Appellate Division provided the

following factual summary of the trial evidence:

> In the evening hours of March 1, 2002, Dr. Jeffrey Perchick
> and his wife, Joanne, arrived at the Wyndham Hotel in Elizabeth,
> to stay overnight. They planned to board a flight to Mexico from
> Newark Airport the next morning. After helping his wife carry
> their bags into the lobby, Dr. Perchick went outside to park the car.
> At the time, he was carrying his wallet and a money clip.
>
> Shortly after Dr. Perchick left the hotel lobby, a guest at the
> Hampton Inn, a hotel adjacent to the Wyndham, observed a "dark
> skinned" man wearing a "blue and black checkered lumberjack
> like jacket" standing over, and going through the pockets of, an
> "older man" with "a light complexion," who was lying on the
> ground of the Wyndham Hotel parking lot. At one point, the "dark
> skinned" man walked away, leaving the other man on the ground.
> The Hampton Inn guest immediately called down to the front desk
> of his hotel to report what he had witnessed.
>
> In response to the call, the manager of the Hampton Inn
> called Kevin Reggio, the Assistant Front Office Manager at the
> Wyndham Hotel. The Hampton Inn manager was nearly
> "hysterical" as she told Reggio that someone was being robbed in
> the Wyndham parking lot. Reggio radioed the information to the
> hotel's staff, ran out the side of the building, and came upon Dr.
> Perchick, lying in the second of four lanes in the parking lot.
> Although easily accessible to pedestrian traffic, the parking lot was
> designed to control vehicular traffic by providing only two exits
> for automobiles. Both of these exit points were staffed by hotel
> personnel that night.
>
> Reggio estimated that he came upon Dr. Perchick on the
> ground within twenty to twenty-five seconds after receiving the
> call from the Hampton Inn manager. As several employees began
> to communicate on their radios and run outside, Mrs. Perchick
> began to suspect that something was wrong with her husband, and
> ran outside as well. The hotel employees brought her back into the
> hotel and attempted to restrain her from going outside. . . .
>
> According to Mrs. Perchick, her husband was carrying
> between $580 and $680 in his money clip.
>
> Dr. Perchick died from his injuries.…
>
> [According to the Medical Examiner,] [t]he cause of death
> was a "[g]unshot wound of head massive brain trauma." The
> location of wounds suggested that the assailant shot the victim in
> the back while he was in the process of running away, causing the

victim to fall. Detective William Syers of the Elizabeth Police Department transported a bullet and bullet fragment that were removed from Dr. Perchick's body to the Essex County Sheriff's Department Ballistics Unit.

On April 6, 2002, Elizabeth police officers arrested Nathan Eustache, a person characterized as a friend of defendant. He was charged with possession of a weapon, a .32 caliber revolver with a blue handle. An examination of this revolver by the Sheriff's Ballistics Unit determined that there was a match between this weapon and the bullet removed from the body of Dr. Perchick. Eustache gave two conflicting accounts to the police of how he had come to possess the weapon. In the first statement, Eustache claimed that he found the gun on the street; in the second, he alleged he received the gun from Makenson Clermont, another individual with connections to defendant. In the course of investigating Clermont, the police also began to investigate defendant.

On April 23, 2002, plain-clothes Detectives Riley, Olivero, and Syers of the Elizabeth Police Department went to defendant's home to question him, but were informed that he was at the Irvington Municipal Court. The Detectives went to the municipal court and advised a court officer that they wanted to speak to defendant before he left. They specifically indicated, however, that he was not under arrest. When the court officer brought defendant out to meet the detectives, they informed him that they would like to speak to him after his business before the municipal court was concluded. Defendant agreed.

Defendant met the detectives thereafter, and agreed to go with them to the Elizabeth Police Department. He was transported in an unmarked police vehicle; and, although briefly patted down for security purposes, he was not handcuffed for the journey. The detectives brought defendant to an interview room in the Detective Bureau. They informed him that they were seeking information about a homicide that occurred in Elizabeth on March 1, 2002. He was given no further details of the crime. The detectives explained to defendant that he had a right to not speak with them. The police did not administer *Miranda*[1] warnings, because, in their view, defendant was not in custody during this initial encounter.

Defendant eventually gave a statement, and agreed to submit to a polygraph test. After the completion of the polygraph, the police advised defendant that "he may not have been truthful with [them] in its entirety." Three hours after this initial statement, defendant gave a second statement, but denied any involvement in the homicide. The defendant was released without charge and driven home by the police.

Several days later, the police returned to defendant's house armed with a warrant, and arrested him. This time, defendant was read his *Miranda* rights in English and Creole. He agreed to waive these rights, and gave an inculpatory statement admitting receipt of the .32 revolver in February 2002, and retaining possession of it until March 10, 2002.[2]

*State v. Pierre-Louis*, No. 02-10-01296-I, 2007 WL 1094352, at *1–3 (App. Div. Apr. 13, 2007).

As explained by the Appellate Division, statements from several of Petitioner's friends connecting him to the crime and the weapon were also admitted at trial:

Prior to the commencement of the trial, the court conducted a N.J.R.E. 404(b) hearing concerning the proposed testimony of Lamar Williamson (a/k/a "Son Son"). He testified that defendant was his friend, and that they belonged to a group called the "Playboys." According to Williamson, the group had five members: himself, defendant, Stanley Tranquille, Steven Charles, and a person named Giovanni, whose last name he did not know. The group attended night classes together at Irvington High School from 3:30 p.m. to 8:45 p.m.

In his statement to the police, Williamson alleged that on February 14, 2002, defendant showed him the revolver used to shoot Dr. Perchick. Defendant told him that he needed money, and said that they should "go do some stick-ups." Defendant told him that he robbed a man for a lot of money, and shot him somewhere in the back as he ran.

Clermont testified that ten days after Dr. Perchick was murdered, defendant gave him a revolver, and instructed him to hold on to it because he did not want to bring it to school. Clermont claimed that he had seen defendant with the revolver before; the handle of the gun was brown the first time he saw it, and blue the second time. Defendant returned later in the day to retrieve the revolver, because he was having an altercation with members of the Crips gang. According to Clermont, defendant shot a member of the Crips in this altercation. Thereafter, defendant gave Clermont the gun to hold, but asked for it back two days later. Later that month, Eustache, another person identified as defendant's friend, asked Clermont to help him convince defendant

---

[2] After opening statements from counsel, the court held a *Miranda* hearing, and admitted into evidence all three of defendant's statements to the police. After conceding the admissibility of the third statement, defense counsel unsuccessfully argued against the admissibility of the first two. *See id.* at *4.

to lend him the revolver. Defendant eventually agreed, and gave the weapon to Eustache.

Stanley Tranquille, who had given an earlier statement to the police implicating defendant in the robbery/homicide, recanted the portion of his statement that asserted that defendant carried the revolver most of the time. Although he reaffirmed that defendant had told him about robbing and shooting a man, he recanted that defendant described the incident to him in detail.

The next witness to testify at this pretrial hearing was Mark Manasse, another member of the Playboys. He reaffirmed his earlier statement: that defendant usually had his gun. He did not know, however, if defendant had the weapon at the time of the homicide. According to Manasse, defendant did not drive, and, instead, was usually driven around by Giovanni or Williamson. Jean Rudy Colin, another individual identified as a friend of defendant, testified that he knew defendant had a gun, but did not know when he had it. Steven Charles, another of defendant's acquaintances, testified that defendant carried the gun on a regular basis.

The court admitted all of the statements regarding defendant's possession of the weapon.

*Id.* at *3–4.

The jury convicted Petitioner of aggravated manslaughter, as a lesser included offense of murder, N.J.S.A. 2C:11-4a(1) and/or (2); first-degree robbery, N.J.S.A. 2C:15-1; first-degree felony murder, N.J.S.A . 2C:11-3a(3); third-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5b; and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4a. *Id.* at 6. At the sentencing hearing, the trial court merged aggravated manslaughter, first-degree robbery, and second-degree possession of a weapon for an unlawful purpose, with the conviction for first-degree felony murder, and sentenced defendant to a forty-five-year term of imprisonment, with an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act ("NERA"), N.J.S.A . 2C:43-7.2. *Id.* On the conviction for third-degree unlawful possession of a weapon, the court sentenced defendant to a term of five years, to run consecutive to the forty-five-year term for first-degree felony murder. *Id.*

Petitioner appealed his conviction and sentence, and the Appellate Division vacated Petitioner's third-degree unlawful possession of a weapon and remanded for re-sentencing, but otherwise affirmed Petitioner's convictions and sentence.[3]  *See id.*

In his PCR petition, filed on August 6, 2007, Petitioner alleged, among other things, that he was denied his federal and state constitutional rights to the effective assistance of counsel and to due process because his trial attorney failed to adequately investigate his case, failed to serve the alibi notice required by Rule 3:12–2, and failed to assert an alibi defense.  Petitioner's PCR petition was submitted to Judge John Triarsi, who had presided over Petitioner's jury trial.  Following an evidentiary hearing on January 12, 2009, the judge ruled that Petitioner satisfied the two-prong test established in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and he entered an order vacating Petitioner's judgment of conviction.

On January 26, 2009, the State filed a motion for reconsideration to expand the record, which was granted.  Following a second evidentiary hearing on January 29, 2009, Judge Triarsi issued an oral decision on January 30, 2009, finding that Petitioner failed to meet either prong of *Strickland*, denying the PCR, and reinstating Petitioner's conviction and sentence.[4]

The Appellate Division affirmed the denial of Petitioner's PCR petition substantially for the reasons stated by Judge Triarsi on January 30, 2009.  *State v. Pierre-Louis*, No. 02-10-01296-I, 2012 WL 3552932, at *2 (App. Div. Apr. 13, 2007).

The New Jersey Supreme Court subsequently granted Petitioner's petition for certification.  *See State v. Pierre-Louis*, 213 N.J. 569 (2013).  In a separate decision, the New Jersey Supreme Court determined that the factual findings by the PCR trial court were

---

[3] It does not appear that this resentencing ever occurred.

[4] Thereafter, Petitioner filed a Motion for Reconsideration, which was denied.  Exhibits 14, 16.

insufficient to allow for a definitive ruling, reversed the PCR trial court's order dated January 30, 2009, and remanded for a new evidentiary hearing. The New Jersey Supreme Court stated that the new evidentiary hearing should be conducted before a different trial judge and include live testimony from witnesses. *See State v. Pierre-Louis*, 216 N.J. 577, 579-80 (2014).

On remand, a different trial judge, Judge Joseph P. Donohue, conducted an evidentiary hearing regarding Petitioner's claims that trial counsel failed to investigate and present his alibi defense, i.e., that was he was home playing video games with friends when Dr. Perchick was murdered. *See* Exhibits 56-61. Following the hearing, Judge Donohue denied the PCR in a written decision. Exhibit 26.

Petitioner appealed, and the Appellate Division affirmed substantially for the reasons expressed by Judge Donohue in his written decision. *See State v. Pierre–Louis*, No. 02-10-01296-I, 2017 WL 3879301, at *3 (App. Div. Sept. 6, 2017). On February 9, 2018, the New Jersey Supreme Court denied certification. *State v. Pierre–Louis*, 232 N.J. 159, 160 (2018).

Petitioner's initial federal habeas Petition was docketed on April 4, 2018. *See* ECF No. 1. Petitioner thereafter filed an Amended Petition, dated September 10, 2018, which raises five claims for relief. ECF No. 6. Respondents filed their answer on May 28, 2019, and Petitioner filed his traverse on July 8, 2019. *See* ECF Nos. 15-16. The matter is fully briefed and ready for disposition.

## II.   <u>STANDARD OF REVIEW</u>

Section 2254(a) permits a court to entertain only claims alleging that a person is in state custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Petitioner has the burden of establishing each claim in the petition. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013). Under 28 U.S.C. § 2254, as amended by the Antiterrorism and

Effective Death Penalty Act ("AEDPA") of 1996, Pub. L. No. 104-132, tit. I, § 101 (1996), 28

U.S.C. § 2244, federal courts in habeas corpus cases must give considerable deference to

determinations of state trial and appellate courts. *See Renico v. Lett*, 599 U.S. 766, 772 (2010).

Section 2254(d) sets the standard for granting or denying a writ of habeas corpus:

> (d) An application for a writ of habeas corpus on behalf of a person
> in custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the
> merits in State court proceedings unless the adjudication of the
> claim-
>> (1) resulted in a decision that was contrary to, or involved
>> an unreasonable application of, clearly established Federal
>> law, as determined by the Supreme Court of the United
>> States; or
>> (2) resulted in a decision that was based on an unreasonable
>> determination of the facts in light of the evidence presented
>> in the State court proceeding.

28 U.S.C. § 2254(d).

Where a state court adjudicated a petitioner's federal claim on the merits,[5] a federal court

"has no authority to issue the writ of habeas corpus unless the [state c]ourt's decision 'was

contrary to, or involved an unreasonable application of, clearly established Federal Law, as

determined by the Supreme Court of the United States,' or 'was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding.'"

*Parker v. Matthews*, 567 U.S. 37, 40-41 (2012) (quoting 28 U.S.C. § 2254(d)).

"[C]learly established law for purposes of § 2254(d)(1) includes only the holdings, as

opposed to the dicta, of t[he Supreme Court's] decisions," at of the time of the relevant state-

---

[5] "For the purposes of Section 2254(d), a claim has been 'adjudicated on the merits in State court
proceedings' when a state court has made a decision that (1) finally resolves the claim, and (2)
resolves th[at] claim on the basis of its substance, rather than on a procedural, or other, ground."
*Shotts v. Wetzel*, 724 F.3d 364, 375 (3d Cir. 2013) (citation and internal quotation marks
omitted).

court decision.  *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).  A decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d) (1) if the state court "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result."  *Williams*, 529 U.S. at 405-06.  Under the "'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] [Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Williams*, 529 U.S. at 413.  As to 28 U.S.C. § 2254(d)(1), a federal court must confine its examination to evidence in the record.  *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).

Where a petitioner seeks habeas relief, pursuant to § 2254(d)(2), on the basis of an erroneous factual determination of the state court, two provisions of the AEDPA necessarily apply.  First, the AEDPA provides that "a determination of a factual issue made by a State court shall be presumed to be correct [and] [t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  29 U.S.C. § 2254(e)(1); *see Miller–El v. Dretke*, 545 U.S. 231, 240 (2005).  Second, the AEDPA precludes habeas relief unless the adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

In addition to the above requirements, a federal court may not grant a writ of habeas corpus under § 2254 unless the petitioner has "exhausted the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).  To do so, a petitioner must "'fairly present' all federal claims to the highest state court before bringing them in federal court."  *Leyva v. Williams*, 504

F.3d 357, 365 (3d Cir. 2007) (citing *Stevens v. Delaware Corr. Ctr.*, 295 F.3d 361, 369 (3d Cir. 2002)).  This requirement ensures that state courts "have 'an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights.'"  *Id.* (citing *United States v. Bendolph*, 409 F.3d 155, 173 (3d Cir. 2005) (quoting *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981)).

Even when a petitioner properly exhausts a claim, a federal court may not grant habeas relief if the state court's decision rests on a violation of a state procedural rule.  *Johnson v. Pinchak*, 392 F.3d 551, 556 (3d Cir. 2004).  This procedural bar applies only when the state rule is "independent of the federal question [presented] and adequate to support the judgment." *Leyva*, 504 F.3d at 365-66 (citing *Nara v. Frank*, 488 F.3d 187, 196, 199 (3d Cir. 2007); *see also Gray v. Netherland*, 518 U.S. 152 (1996), and *Coleman v. Thompson*, 501 U.S. 722 (1991)). If a federal court determines that a claim has been defaulted, it may excuse the default only upon a showing of "cause and prejudice" or a "fundamental miscarriage of justice."  *Leyva*, 504 F.3d at 366 (citing *Lines v. Larkins*, 208 F.3d 153, 166 (3d Cir. 2000)).

To the extent that a petitioner's constitutional claims are unexhausted and/or procedurally defaulted, a court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2).  *See Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007) ("Here, because we will deny all of [petitioner's] claims on the merits, we need not address exhaustion"); *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir. 2005) (considering procedurally defaulted claim, and stating that "[u]nder 28 U.S.C. § 2254(b)(2), we may reject claims on the merits even though they were not properly exhausted, and we take that approach here").

## III.   ANALYSIS

Petitioner's Amended Petition expressly asserts five grounds for relief based on ineffective assistance of trial counsel.  Specifically, in Grounds One and Two, Petitioner argues

that counsel was ineffective for failing to investigate an alibi defense, failing to file a Notice of Alibi, and failing to present an alibi defense at trial.  In Ground Three, Petitioner asserts counsel's performance at the pre-trial *Miranda* hearing was deficient.[6]  In Ground Four, Petitioner argues that counsel was ineffective for failing to object to comments the prosecutor made during summation.[7]  In Ground Five, Petitioner asserts that counsel's cumulative errors deprived him of a fair trial.  The Court addresses these claims in turn.

　　　　To succeed on an ineffective assistance of counsel claim, petitioner must establish that: (1) counsel's performance was deficient; and (2) this inadequate representation "prejudiced the defense."  *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Williams v. Taylor*, 529 U.S. 362, 390-1 (2000).  To establish ineffective assistance of counsel "a defendant must show both deficient performance by counsel and prejudice."  *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009).  The Supreme Court instructs that a court need not address both components of an ineffective assistance claim "if the defendant makes an insufficient showing on one."  *Strickland*, 466 U.S. at 697.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  *Id.*

　　　　To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness."  *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (citing *Strickland*, 466 U.S. at 688).  A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance.  *Id.* (citing *Strickland*, 466

---

[6] In light of Petitioner's pro se status, the Court also addresses the *Miranda* claim Petitioner asserted on direct appeal.

[7] In light of Petitioner's pro se status, the Court also addresses the prosecutorial misconduct claim Petitioner asserted on direct appeal.

U.S. at 689). In this regard, "[t]he law does not require counsel to raise every available nonfrivolous defense." *Knowles v. Mirzayance*, 556 U.S. 111, 127 (2009) (counsel correctly did not pursue an insanity defense that "had almost no chance of success"). The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Harrington* 562 U.S. at 687.

With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (citing *Strickland*, 466 U.S. at 694). It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* (citing *Strickland*, 466 U.S. at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* (citing *Strickland*, 466 U.S. at 687).

"Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult" and focuses on "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 562 U.S. at 105.

### a. Failure to Investigate, File a Notice of Alibi, and Present Alibi Defense (Grounds One and Two)

In Ground One, Petitioner asserts that counsel was ineffective for failing to investigate and present an alibi defense. Petitioner further alleges in Ground Two, that counsel's failure to file a Notice of Alibi prevented counsel from eliciting favorable testimony from Mark Manasse, a member of the Playboys.

As noted above, the PCR court held an evidentiary hearing on Petitioner's alibi claim and initially granted the PCR limited to the claim that counsel was ineffective for failing to

investigate the alibi defense.  On January 26, 2009, the State filed a motion for reconsideration based upon "recently located files" that contained notes of interviews conducted by Robert Hasanoeddin, the Public Defender's trial investigator.  The judge held a second evidentiary hearing on January 29, 2009, and heard testimony from Hasanoeddin, Petitioner's trial counsel, and an Assistant Deputy Public Defender, who represented Petitioner before trial counsel.  The PCR judge reversed its decision granting PCR and reinstated Petitioner's conviction and sentence, and this decision was affirmed by the Appellate Division.

The New Jersey Supreme Court granted certification and reversed as follows:

> Based on our review of the trial court's oral opinion delivered on January 30, 2009, we conclude that the court's findings were not sufficient on either prong of the *Strickland/Fritz* standard to allow for a definitive ruling on defendant's PCR petition or appellate review of that decision. We therefore remand to the trial court for a new hearing. *See State v. Harris*, 181 N.J. 391, 416, 859 A.2d 364 (2004) (noting that appellate court can remand PCR proceedings to different trial court to "generate a new record and render fresh factual findings and legal conclusions" when necessary); *see also State v. Randolph*, 210 N.J. 330, 349, 44 A.3d 1113 (2012) (observing that sentencing judge must evaluate relevant factors and " 'explain[ ] that evaluation on the record in sufficient detail to permit appellate review' " (internal citation omitted)).
>
> At the hearing, the parties should present live testimony of the witnesses they intend to rely on so that the court can make credibility findings and draw legal conclusions as to both prongs of the *Strickland/Fritz* test. The court may invite the parties to submit proposed findings of fact after the presentation of evidence. We offer no opinion as to the appropriate outcome of the hearing.

*Pierre-Louis*, 216 N.J. 577, 579–80.

At the evidentiary hearing before Judge Donohue, live testimony was taken from seven witnesses: Petitioner, Desir Pierre-Louis (Petitioner's father), Mydege Pierre-Louis (Petitioner's Sister), Giovanni Clermont (one of Petitioner's friends), Wayne Morse, Robert Hasanoeddin, and

Frank Krack. *See* State's Exhibit 26.  The Appellate Division remand decision summarized

Judge Donohue's factual findings and rulings as follows:

> Judge Donohue found that the testimony provided by defendant and his three witnesses, his father, sister, and a friend, was not believable. He noted that in December 2002, before defendant received the discovery from the State, defendant advised his first counsel to present an alibi defense that he was in school when the murder occurred. Defendant's alibi changed in June 2006, a year after he received the discovery. Since his school classes were over at 9:30 p.m., defendant told his second trial counsel that he was home playing videogames with friends when the murder occurred. The judge also pointed out that despite giving three statements to police shortly following the murder in 2002, it was not until June 2006 that defendant mentioned the videogames alibi.

> The judge further noted that defendant's father and sister did not give formal statements supporting his videogame alibi until August 2008, and that his friend also waited years to give an alibi statement for defendant, but could not recall to whom he gave the statement. In sum, the judge found defendant and his witnesses to be vague and evasive.

> On the other hand, Judge Donohue found the State's witnesses, defendant's two counsel and the Office of Public Defender investigator, were credible and not "deceitful or disingenuous," and that a more than adequate defense investigation was conducted. Before discovery was provided to the defense, defendant's first counsel had the investigator speak with defendant and obtain his school records, which indicated that defendant was absent the day of the murder. The investigator also spoke to two of defendant's teachers and several of his friends, who stated they were in school with defendant from 3:00 p.m. to 9:00 p.m. the day of the murder. After the second defense counsel took over, he decided not to pursue the school alibi because the murder occurred around 10:15 p.m., forty-five minutes after defendant's last class. Counsel then focused his investigation on the strength of defendant's newly raised videogame alibi.

> After meeting defendant's father and sister, counsel determined they lacked credibility and would not be good witnesses. At a pre-trial N.J.R.E. 404(b) hearing regarding defendant's alleged possession of the murder weapon, counsel subpoenaed defendant's friends who were allegedly playing videogames with him when the murder occurred. Counsel concluded they gave "angry, inconsistent, and unbelievable"

> testimony and would not be good alibi witnesses. Defendant's
> friend, who Judge Donohue noted was not credible at the PCR
> evidentiary hearing, did not testify at the 404(b) hearing.
> Importantly, the second defense counsel testified that defendant
> agreed with his trial strategy not to present the alibi defense
> because his friends and family would not be good witnesses.
> Hence, counsel pursued the strategy of third party guilt and the
> State's inability to prove defendant's guilt beyond a reasonable
> doubt.
>
> Applying his factual findings, Judge Donohue reasoned that
> defendant failed to demonstrate that his counsel were ineffective as
> required by the first prong of *Strickland/Fritz* test. The judge
> determined that there was no "lack of investigation or preparation"
> and counsel provided "sound legal strategy [ ] not [to] put forward
> an alibi defense." As for the test's second prong, the judge found
> there was no prejudice to defendant by not presenting the alibi
> defense because his family and friends did not provide credible
> testimony to support an alibi, and his friends' 404(b) testimony
> linked him to the murder weapon. This appeal followed.

*State v. Pierre–Louis*, No. 02–10–1296, 2017 WL 3879301, at *2–3 (App. Div. Sept. 6, 2017).

The Appellate Division concluded that the alibi claims were "without sufficient merit to

warrant discussion in a written opinion[,] R. 2:11–3(e)(2)" and "affirm[ed] substantially for the

reasons expressed by Judge Donohue in his thorough and well-reasoned written decision."

*Id.* at *3.

The Appellate Division's remand decision did not unreasonably apply *Strickland* with

respect to Petitioner's alibi claims.  Nor does the Appellate Division's decision involve an

unreasonable determination of the facts in light of the evidence.  Following a full evidentiary

hearing, Judge Donohue found that Petitioner and his witnesses were not credible principally

because they waited years to come forward to say that Petitioner was home playing video games

at the time of the crime.  In contrast, Judge Donohue found the testimony of defendant's two

counsel and the Office of Public Defender investigator to be credible, and that testimony showed

that the alibi defense was investigated but that counsel and Petitioner himself agreed that the

defense would not be successful.  Because the alibi defense was investigated and ultimately

discarded as a matter of strategy, Judge Donohue determined that Petitioner did not show

deficient performance.  Judge Donohue also found there was no prejudice to defendant by not

presenting the alibi defense because his family and friends did not provide credible testimony to

support an alibi, and his friends' 404(b) testimony linked him to the murder weapon.  Petitioner's

counsel's failure to file the Notice of Alibi under these circumstances likewise does not amount

to ineffective assistance.  The conclusions reached by Judge Donohue and affirmed by the

Appellate Division do not unreasonably apply either prong of *Strickland* or involve an

unreasonable determination of the facts.  As such, the Court denies relief as to Grounds One and

Two of the Petition.

**b.  *Miranda* Claims (Ground Three)**

In Ground Three, Petitioner alleges that he was deprived of effective assistance of

counsel due to his trial attorney's deficient performance at the pre-trial *Miranda* hearing.  The

Court addresses this claim as raised in both Petitioner's direct appeal and his PCR.  The

Appellate Division summarized the facts underlying the *Miranda* claim as follows:

> On April 23, 2002, plain-clothes Detectives Riley, Olivero, and Syers of the Elizabeth Police Department went to defendant's home to question him, but were informed that he was at the Irvington Municipal Court. The Detectives went to the municipal court and advised a court officer that they wanted to speak to defendant before he left. They specifically indicated, however, that he was not under arrest. When the court officer brought defendant out to meet the detectives, they informed him that they would like to speak to him after his business before the municipal court was concluded. Defendant agreed.
>
> Defendant met the detectives thereafter, and agreed to go with them to the Elizabeth Police Department. He was transported in an unmarked police vehicle; and, although briefly patted down for security purposes, he was not handcuffed for the journey. The detectives brought defendant to an interview room in the Detective Bureau. They informed him that they were seeking information about a homicide that occurred in Elizabeth on March 1, 2002. He was given no further details of the crime. The detectives explained

> to defendant that he had a right to not speak with them. The police did not administer *Miranda*[1] warnings, because, in their view, defendant was not in custody during this initial encounter.
>
> Defendant eventually gave a statement, and agreed to submit to a polygraph test. After the completion of the polygraph, the police advised defendant that "he may not have been truthful with [them] in its entirety." Three hours after this initial statement, defendant gave a second statement, but denied any involvement in the homicide. The defendant was released without charge and driven home by the police.
>
> Several days later, the police returned to defendant's house armed with a warrant, and arrested him. This time, defendant was read his *Miranda* rights in English and Creole. He agreed to waive these rights, and gave an inculpatory statement admitting receipt of the .32 revolver in February 2002, and retaining possession of it until March 10, 2002.

*Pierre-Louis*, 2007 WL 1094352, at *3.

After opening statements from counsel, the court held a *Miranda* hearing.  After conceding the admissibility of the third statement, defense counsel unsuccessfully argued against the admissibility of the first two.  *See* Exhibit 39 at 83; *see also id.* at *4.  Petitioner did not testify at the *Miranda* hearing.  The trial court ruled that Petitioner was not in custody when the first two statements were given on April 23, 2002, that none of the three statements were obtained in a manner contrary to *Miranda*, and that they were admissible at trial.  *See* Exhibit 39 at 83-86.

Petitioner argued on direct appeal that the trial court erred in admitting Petitioner's statements, and the Appellate Division determined that this issue lacked sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).  *See Pierre-Louis*, 2007 WL 1094352, at *4.

In his PCR petition, Petitioner attempted to bolster his arguments that counsel was unprepared for trial and referenced a sidebar discussion about the admissibility of the three statements.  *See* Exhibit 17, Appendix Petitioners Brief and Appendix on Appeal of Denial of

Petition at 123-126.  In the sidebar discussion, Petitioner's counsel argued unsuccessfully that it would be fundamentally unfair to admit the statements because the state had not mentioned the statements in its opening argument.  *See id.*  Petitioner alleged "[a]s can be seen from the above colloquy [referencing the admissibility of statements Petitioner made to police], trial counsel was not prepared and claimed surprise when the State used the Petitioner's statements even after there was a *Miranda* hearing." *Id.* at 126.  The Appellate Division rejected this claim without additional discussion.  *Pierre-Louis*, 2012 WL 3552932, at *2 (citing N.J. Ct. R. 2:11–3(e)(2)).  Petitioner raised this claim in his petition for certification, and the Supreme Court reversed and remanded for a second evidentiary hearing on the alibi claim(s).  Petitioner did not reraise this claim after his PCR was denied on remand.[8]

The Appellate Division did not unreasonably apply clearly established federal law in rejecting Petitioner's direct appeal claim that the trial court erred in admitting the unwarned statements on April 23, 2002.  It is well-established that no *Miranda* warning is required absent a "custodial interrogation."  A custodial interrogation exists if police initiate questioning, or its equivalent, after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.  *Thompson v. Keohane*, 516 U.S. 99, 107 (1995); *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980).  A person is in custody if, given the circumstances surrounding the interrogation, a reasonable person would not have felt free to terminate the interrogation and leave.  *United States v. Jacobs*, 431 F.3d 99, 105 (3d Cir. 2005).  Courts consider many factors in "determining if a person was in custody, including: (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical

---

[8] The Court assumes that the New Jersey Supreme Court rejected this claim without discussion based on the limited remand.  To the extent the ineffective assistance claim is unexhausted, the Court denies it on the merits.

surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning." *United States v. Willaman*, 437 F.3d 354, 359–60 (3d Cir. 2006). Under Supreme Court precedent, *Miranda* custody requires "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *New York v. Quarles*, 467 U.S. 649, 655 (1984) (internal quotations omitted); *see also Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam). Moreover, the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned. *Stansbury*, 511 U.S. at 323-324 ("It is well settled, then, that a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda*").

At the *Miranda* hearing, trial court the trial court determined that a reasonable person in Petitioner's position would have felt that he was free to leave the police station, as he had been advised by the officers that he was free to refuse their request to come to the station for questioning and the officers did not disclose to Petitioner that he was a suspect in the homicide or make any coercive statements. The fact that Petitioner was questioned at the police station for several hours does not establish custody, absent evidence of coercion. *See Berghuis v. Thompkins*, 560 U.S. 370, 387 (2010) (finding "no authority for the proposition that an interrogation [of three hours at police station] is inherently coercive. Indeed, even where interrogations of greater duration were held to be improper, they were accompanied, as this one was not, by other facts indicating coercion, such as an incapacitated and sedated suspect, sleep and food deprivation, and threats.").

On direct appeal, Petitioner also asserted that the third statement was inadmissible as fruit of the poisonous tree. The Court disagrees. In *Oregon v. Elstad*, 470 U.S. 298 (1985), the suspect made an initial incriminating statement at his home and did not receive *Miranda* warnings before making the statement, because it was not clear whether the suspect was in custody at the time. The suspect was taken to the station house, where he received a proper warning, waived his *Miranda* rights, and made a second statement. The Court held that, although a *Miranda* violation made the first statement inadmissible, the postwarning statements could be introduced against the accused because "neither the general goal of deterring improper police conduct nor the Fifth Amendment goal of assuring trustworthy evidence would be served by suppression" given the facts of that case. *Elstad*, *supra*, at 308. In contrast, where the "warned phase of questioning proceeded after a pause of only 15 to 20 minutes, in the same place as the unwarned segment," the postwarning statements would be inadmissible as fruit of the poisonous tree. *See Missouri v. Seibert*, 542 U.S. 600, 616 (2004).

Here, the first two statements are admissible, and, thus, the third statement would not be excludable as fruit of the poisonous tree. But even if the first two statements were inadmissible because Petitioner was in custody, the third statement would have been admissible pursuant to *Elstad* because Petitioner gave the third statement after proper *Miranda* warnings two weeks after the first two unwarned statements. Moreover, there is nothing to suggest that suppressing the third statement would serve the goals of deterring police misconduct or assuring trustworthy evidence.[9]

---

[9] On direct appeal Petitioner argued that the sequence of events is analogous to *State v. Hartley*, 103 N.J. 225, 232 (1986), where a defendant was first given his *Miranda* rights, invoked them, and was subsequently re-interrogated without new *Miranda* rights. Here, however, Petitioner was Mirandized during the second interaction and not the first, and, thus, the decision in *Hartley* is not on point.

Finally, Petitioner appears to argue that his trial counsel was ineffective for conceding the admissibility of the third statement and for allegedly not realizing that the statements could be used by prosecutors at trial.  As explained above, the third statement would not have been excludable as fruit of the poisonous tree because the first two statements were admissible.  Thus, Petitioner is unable to show he was prejudiced by his attorney's concession.  As to Petitioner's argument that his counsel was unprepared for trial, he fails to show that he was prejudiced by his counsel's alleged lack of preparation or the unsuccessful attempt to exclude the statements at trial.

For these reasons, the Court denies relief on the *Miranda* claim(s) in Ground Three.

### c.  Failure to Object during Prosecutor's Summation (Ground Four)

In Ground Four, Petitioner alleges that counsel was deficient for failing to object during the prosecutor's summation.  Specifically, Petitioner alleges counsel should have objected to the prosecutor's use of the term "alpha dog" during summation to describe Petitioner's role as the leader of the Playboy's.  Petitioner argued on direct appeal that the prosecutor's use of the term "alpha dog" violated federal law, and the Appellate Division rejected this argument as "lack[ing] sufficient merit to warrant discussion in a written opinion." *Pierre-Louis*, 2007 WL 1094352, at *4  (citing N.J. Ct. R. 2:11-3(e)(2)).  Petitioner also asserted on PCR that his attorney was ineffective for failing to object to the prosecutor's repeated use of the term "alpha dog" in summation, and the Appellate Division determined that this argument did "not warrant any additional discussion." *Pierre-Louis*, 2012 WL 3552932, at *2 (citing N.J. Ct. R. 2:11–3(e)(2)).  Petitioner raised this argument in his petition for certification, and the New Jersey Supreme

Court remanded the matter back to the PCR court for the alibi claims only.  Petitioner did not

reraise this claim after his PCR was denied on remand.[10]

In *Darden v. Wainwright*, 477 U.S. 168 (1986), the Supreme Court explained that a

prosecutor's improper comments will be held to violate the Constitution only if they "'so

infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.*

at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *see also Parker v.*

*Matthews*, 567 U.S. 37, 45 (2012). "[I]t is not enough that the prosecutors' remarks were

undesirable or even universally condemned...[t]he relevant question is whether the prosecutors'

comments so infected the trial with unfairness as to make the resulting conviction a denial of due

process." *Id.* at 181 (internal citations and quotation omitted).  Here, Plaintiff is unable to show

that the use of this phrase to four times to describe Petitioner's role as the leader of the Playboys

infected Petitioner's entire trial with unfairness, and the Appellate Division did not unreasonably

reject this claim on direct appeal.  Because the prosecutor's comments do not rise to the level of

prosecutorial misconduct, Petitioner is unable to show his attorney was deficient for failing to

object to the comments in summation.  Moreover, Petitioner fails to establish how the use of this

phrase four times in the course of a thirty-six-page summation prejudiced him at trial.  As such,

Petitioner cannot establish either prong of *Strickland*.

### d. Cumulative Errors Deprived Plaintiff of Effective Assistance of Counsel (Ground Five)

Finally, Petitioner argues that cumulative errors by his counsel, as outlined in his other

claims, deprived him of a fair trial.  While individual errors may not entitle a Petitioner to relief,

when combined, the cumulative effect may entitle a Petitioner to habeas relief when the errors

---

[10] The Court assumes that the New Jersey Supreme Court rejected this claim without discussion based on the limited remand.  To the extent this claim is unexhausted, the Court denies it on the merits.

have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643.  Such cumulative errors must have a "substantial and injurious effect or influence on the jury's verdict." *Brect v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal citation omitted).  A habeas Petitioner is not entitled to relief based on the effect of cumulative errors unless he can establish "actual prejudice." *Albrect v. Horn*, 485 F.3d 109, 139 (3d Cir. 2007) (quoting *Brecht*, 507 U.S. at 637).  To show actual prejudice, "[t]he habeas Petitioner must show 'not merely that the errors at ... trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Murray v. Carrier*, 477 U.S. 478, 494 (1986) (emphasis in original). Lastly, where there is weighty evidence of a Petitioner's guilt, despite alleged errors, the cumulative error standard has not been met.  *Fahy v. Horn*, 516 F.3d 169 (2008).

Here, Petitioner utterly fails to show that he was denied a fair trial based on his counsel's cumulative errors or that he was prejudiced by these alleged errors.  He also fails to establish that the state court decisions on each of his habeas claims were contrary to, or involved an unreasonable application of clearly established federal law or an unreasonable determination of the facts.  28 U.S.C. §2254(d)(1); (d)(2).  The Court, therefore, denies relief on Ground Five.

## IV.    CERTIFICATE OF APPEALABILITY

Having denied relief on Petitioner's habeas claims, the Court will also deny a Certificate of Appealability ("COA"). Pursuant to 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a habeas proceeding unless he has "made a substantial showing of the denial of a constitutional right." Because Petitioner has not made a substantial showing of the denial of a constitutional right, the Court will deny a COA.

V.     **CONCLUSION**

As explained in this Opinion, the Court denies the Petition and denies a COA.  An appropriate Order follows.

_____
Hon. Madeline Cox Arleo
United States District Judge

DATED: September 28, 2021.